## Case No. 15,909.

### UNITED STATES v. O'BRIEN et al.

[7 Int. Rev. Rec. 61.]

District Court, D. New Jersey. 1868.

INTERNAL REVENUE ACT—FRAUDULENT DISTILLER'S BOND.

[1. On a prosecution for executing and signing a false and fraudulent bond, it is no defense that defendant knew nothing of his sureties, but hired a man to obtain them, and that they swore to all that was required by law.]

[2. Testimony, by a subscribing witness to the bond, that three of the signers thereof signed in his presence, but that the bond was taken away for the other party to sign, and that it was returned with his signature, which the witness proved, having seen him write his name to another bond, is sufficient proof of the execution of the bond by such absent party.]

This was an indictment under section 42 of the internal revenue act of July 13, 1866 [14 Stat. 98], against Luke O'Brien, William H. Hooper, and others, charging the defendants with executing and signing a false and fraudulent distillers' bond.

A. Q. Keasbey, U. S. Dist. Atty., and Henry Young, Asst. U. S. Atty.

Jonathan Dixon, Jr., and Isaac W. Scudder, for defendant.

When the case was called, the defendant's counsel who appeared only for the principals, moved for a separate trial as to them, which was consented to on the part of the government. Mr. Dixon then asked leave to withdraw the plea of not guilty, for the purpose of moving to quash the indictment, which was granted.

The motion to quash was urged on the following grounds: (1) Because the alleged

fraudulent bond was not set out at length in words and figures. (2) Because the allegations in the indictment that the bond was required by the internal revenue laws and regulations, and was attempted to be used in fraud of the internal revenue laws, were made in general terms, without showing how it was required, or in what manner it was attempted to be used. (3) Because the allegations of the false and fraudulent character of the bond were not made with sufficient certainty. (4) Because the statute does not declare the act to be a crime or misdemeanor, and therefore an indictment will not lie.

After argument the judge overruled the motion, stating that the quashing of an indictment was entirely a matter of discretion, and that it would never be done where the defendant had pleaded, and had ample time to make the objection, but had delayed until the witnesses were summoned and the case ready for trial, unless in a case entirely clear of doubt. The court would leave the defendants to their motion in arrest of judgment. The judge went on to discuss the objections made to the indictment, and stated that he was satisfied that none of them could be maintained, and ordered the case to proceed.

FIELD, District Judge (charging jury). This is an indictment for executing and signing a false and fraudulent bond, attempted to be used in fraud of the internal revenue laws. The case is important from the fact of its being the first indictment for this offence that has ever been tried, at least in this district. The whole country is ringing with reports of enormous frauds committed against the revenue laws. They have reached a magnitude perfectly appalling, and unless checked, they threaten to sap the foundations of public credit, to rob the government of its means of support, to bring the law into contempt, and load with reproach our national character. A prolific source of these frauds, the machinery by means of which many of them are effected, is the use of false and fraudulent bonds. Prevent the use of such bonds, and you nip these frauds in the bud.

Let me explain this to you, for it is a matter that may be unfamiliar to most of you. Before a man can engage in the business of distilling whiskey or oil. he must give a bond to the United States, with good and sufficient sureties, to be approved by the collector, with a condition that he will comply with the requirements of law; that he will keep books in the form prescribed, and make true entries of his business, and make faithful returns of his production, and pay all the taxes due thereon, so that, before whiskey could be withdrawn from a bonded warehouse for exportation, re-distillation, or transportation (before the recent change in the law), a bond must be given in like manner; and if these bonds be really good and sufficient, they afford protection to the government against frauds by the distiller, and stand in the place of spirits removed from bonded warehouses. Thus, you perceive, that an easy mode of committing frauds is by palming off upon the collectors false and fraudulent bonds. It is an alarming fact, that many of all such bonds given in relation to the immense trade in whiskey within the last year or two, have been found to be absolutely worthless, and the treasury has thus been defrauded of millions.

But this case is also important from the character of the defense set up. If it is good in this case, it will be good in every indictment for a similar offence. It was admitted that this bond was false and fraudulent. It could not be denied. The testimony of Mr. Vanwinkle, deputy collector, and Mr. Merwin, an inspector, detailed for the special duty of examining revenue bonds, leaves no doubt on this point. Mr. Vanwinkle proves the execution of the bond, and that the sureties, Wm. L. Thomas and Joseph Gregory, were brought to him by O'Brien, and represented by him to be good; that they testified before the collector, on what is known as form 33, in which Thomas swore he lived at 165 Schermerhorn street, Brooklyn, and Gregory, that he was a commission merchant at 27 South street. New York, and owned a house and lot No. 162 West Twenty-seventh street, on the corner of Tenth avenue; and both swore that they were worth $5,000 after all their debts were paid. Mr. Merwin testifies that he went to 165 Schermerhorn street, and found indeed, a Mr. Thomas living there, but not Wm. L. Thomas; it was Wm. M. Thomas, a man of respectability and property, who is also called as a witness. and swears that he never saw or heard of the bond. Mr. Merwin also swears, that he ascertained that Gregory had no place of business, and no business at all but what little he picked up about the wharves. and that there was no such house as 162 West Twenty-Seventh street, near the corner of Tenth avenue, or owned by Gregory.

Having shown the execution of the bond by the defendants, their representations that the sureties were good, and the false and fraudulent character of the bond, the government rested. Now, upon this evidence, the defendant's counsel might have gone before the jury, and with some plausibility have contended that the defendants did not know that the bond was false; that they might themselves have been deceived; that there was nothing to show fraud or guilty knowledge, and that the most that could have been charged was culpable carelessness. But they did not take this course; they asked the court, indeed, to arrest the further progress of the case, and say to the jury that there was no evidence of fraud. This the court could not do. And then they

opened their defence, and called one witness to prove it. And it is the nature of that defence, as I said, that gives the case its chief importance. It seems to me an extraordinary defence. Am I mistaken in my view of it, or is it true, that this tide of demoralization has risen so high and spread so widely, that it has swept away all our old-fashioned notions of honesty, blunted our perceptions of truth, and confounded all our distinctions between right and wrong? What is this defence, and what is the testimony by which it is sustained? The character of the defence is revealed by the evidence of their only witness, Edmund Kimball. He lives in Brooklyn, and calls himself a commission merchant. He was employed by an oil inspector named Elisha W. Hinman, on behalf of the defendants, to get sureties on an oil bond. Not, so far as appears, upon any particular bond, but upon an oil bond generally. Not one word said as to the party for whom the surety was to be given—no explanations as to amount, or place, or business, or the means of the principal. He was simply to get sureties on an oil bond. He was to get $90, and pay the sureties out of this fund. He did get two sureties, Fernald and Van Ness, not for this bond, but the first bond given the week before. He paid them $20 each. They were rejected. I will say nothing now about this bond; I wish, for the present, to keep out of view the testimony of Fernald. But the first bond was rejected, and he had to get new sureties. He told Van Ness he must procure them. Van Ness did so. Kimball knew nothing about them. He met them for the first time when he took them to Jersey City. He there introduced them to the defendants as their sureties. They took the required oaths, which, as has been seen, were false in every particular. The bond was taken by the collector and sent to the revenue board.

This is the only evidence offered by the defendants, and this, their counsel say, is a good defence. It is shown that the defendants knew nothing of these men, and had never seen them before. It did not seem to enter into the minds of the defendants' counsel that there was any impropriety in this course of procedure. They insist, and with sincerity I have no doubt that this was a perfectly fair business transaction, that all business is now done by brokers, that a man may sell his credit as he may sell any other commodity, and they ask what harm is there in doing this kind of business through a broker. Gentlemen, did these men sell their credit, and had they any credit to sell? Did they sell credit worth $5.000 to a stranger for $20? Ought not the defendants to have known that they had no credit? The offering of such testimony shows the extent to which the public mind has become debauched on the subject of frauds on the revenue. This is a kind of

brokerage which does not seem to have been recognized by the framers of the United States revenue laws. They have taxed every calling they could imagine, and brokers of all kinds and classes but surety brokers seem to have escaped. I know that there are men who haunt the purlieus of the criminal courts, and are paid for getting bail for persons charged with crime, but it is the first time I ever heard such employment called a fair business transaction. If this defence is good, all a man has to do is to prove he knew nothing of his sureties, but hired a man to get them, and that they swore to all that was required. It will be a good defence to every indictment under this law. A man need only fold his arms and shut his eyes, and hire two vagabonds to swear that they are worth the amount named in his bond. It cannot be that this is a good defence. A man who resorts to these practices is bound to know the sureties are good. He takes the very steps to get bad ones. I do not say a man may not pay another to become his surety, but it must be under circumstances showing an honest effort to procure a good one. These defendants took the very course that made it certain that their bond would be false and fraudulent.

I have said nothing as to Fernald's testimony. If the defendants ought not to be convicted without it, you might very properly disregard it. He was one of the sureties on the first bond. He says that he came over with Van Ness at Kimball's request, and went with the defendants to the collector's office to sign the bond. That he asked if he ought not to give his residence in New Jersey, and that one of the defendants told him it would be better to do so, and asked him if he had it ready. That he inquired if the collector was fixed, and was told that he was a friend of the defendant O'Brien, and was all right; that he and Van Ness swore to false residences, and that they owned property which had no existence. All this, so far as you may give it credit, tends to show more clearly the intent of the defendants, and that they did not mean to give a good bond so long as a false one would answer. Fernald is loaded with vituperative eloquence by counsel, but it must be remembered that he is the man whom these defendants offered as their surety, a good and sufficient freeholder residing in Hoboken. You must judge which is the worse, the poor wretch who is picked up in the streets of New York, perhaps suffering for bread for his family, and tempted by a surety-broker to sell his worthless credit for $20, or the business man who hires him for twenty dollars to do it, and stands beside him when he takes the oath for his benefit.

As to the proof of the execution of the bond by Hooper, I think it is sufficient. One subscribing witness was called, and proved that three of the parties signed in

his presence, but that the bond was taken away for Hooper to sign, and returned with his signature, which the witness proves, having seen him write his name to the other bond. It must be treated as having been signed in the presence of a witness, and is properly proved.

The questions for you are, whether the bond was false and fraudulent, whether it was executed by the defendants, and whether they had not such knowledge of its character as to make them responsible in justice, in reason, and in morality, for the execution of it, in violation of the statute.

The jury retired, and after an absence of about fifteen minutes returned with a verdict of guilty. The defendants were thereupon immediately sentenced to one year's imprisonment.